UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DIKA BASIC,                          )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )    Case No. 4:11CV2124 SNLJ/FRB
                                     )
CAROLYN W. COLVIN,[1] Commissioner   )
of Social Security,                  )
                                     )
          Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

          This matter is before the Court on plaintiff Dika Basic's

appeal of an adverse decision of the Social Security

Administration.    All pretrial matters were referred to the

undersigned United States Magistrate Judge pursuant to 28 U.S.C. §

636(b) for appropriate disposition.

**I.    Procedural History**

          Plaintiff Dika Basic ("plaintiff") applied for Disability

Insurance Benefits ("DIB") under Title II of the Act, alleging that

she became disabled on January 19, 2009.    (Administrative

Transcript ("Tr.") 120-26).    Plaintiff's application was initially

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

denied, and she requested a hearing before an administrative law judge ("ALJ") which was held on October 1, 2010. (Tr. 22-49). On December 15, 2010, the ALJ issued a decision in which he determined that plaintiff was not disabled under the Act. (Tr. 6-17).

Plaintiff sought review from defendant agency's Appeals Council, which denied her request for review on October 12, 2011. (Tr. 1-3). The ALJ's decision thus stands as the Commissioner's final decision subject to review by this Court under 42 U.S.C. § 405(g).

## II.    Evidence Before The ALJ

A.    <u>Plaintiff's Testimony</u>

During the administrative hearing, plaintiff, age 55, testified that she was born and raised in Olovo, a city near Sarajevo, in Bosnia and Herzegovina, and attained eight years of education there. (Tr. 28). She came to Saint Louis, Missouri in July of 2000. (Tr. 30). Plaintiff testified that she was divorced when she came to live in St. Louis. (Tr. 30). She testified that she had two adult daughters and two grandchildren. (Tr. 28-29).

Plaintiff testified that she could read and write in her native language, but not in English. (Tr. 29). She testified that she could communicate a little bit in English, but kept forgetting the little she knew. (<u>Id.</u>) She testified that she lived alone in an apartment and had to travel small flights of stairs to get to her apartment, which caused dizziness and pain in her legs. (Tr.

37).  She testified that her daughter lived next door in the same building.  (Id.)  Plaintiff testified that she had in fact moved in order to be close to her daughter so that her daughter could help her.  (Id.)  Plaintiff testified that her daughter helped her "quite a bit" including helping her with shopping, some cooking, and cleaning the house.  (Id.)

In Bosnia, plaintiff worked as a retail cashier.  (Tr. 30).  When she came to Saint Louis, she worked for several months packaging shampoo for the ViJon Company.  (Tr. 30-31).  She then worked as a house cleaner at a Hyatt hotel, then worked for Centaur cleaning company, and then worked for five years as a cleaner at a school.  (Tr. 31).  Plaintiff also worked at Eagle Industries as a full time sewing machine operator, and simultaneously worked part time for Centaur.  (Tr. 31-32).

Plaintiff testified that she was presently employed part time as a cleaner at Trinity Company.  (Tr. 32).  She testified that she worked Monday through Friday from 5:00 p.m. until 10:00 p.m., and earned $7.50 per hour.  (Id.)  When plaintiff was asked when she started to work part time, she testified: "I think it was last year in August, 23rd of August I think.  I was forced to do that when I was feeling to [sic] unwell to continue working full time.  That was my decision on my own to do it." (Id.)  Plaintiff testified that she performed the same job duties she used to perform full time, which included emptying trash and taking it out, and dusting furniture.  (Tr. 42).  Plaintiff

testified that she could lift small trash cans, but that lifting large trash cans and vacuuming were too strenuous. (Tr. 43). She estimated she could lift a gallon of milk, and "[m]aybe five to eight pounds." (Id.) She testified she had to alternate sitting and walking, and estimated that she spent 2 ½ hours out of a 5-hour shift seated, but that she could dust while seated. (Tr. 44). She testified that she missed work approximately one day per week. (Tr. 44-45).

When asked why she could no longer work full time, plaintiff testified:

> I'm not sure how to explain this. I started having pain in my legs. I went to see a doctor and he said I should not work for a long time. That was the initial problem and then after that I also felt depression and dizziness. I was afraid to mention those problems at work because I felt that they would let me go. It was becoming worse. They asked me at work what was going on, what was the problem. They would send me home and at that point I decided to work part time. Dr. Kerry [PHONETIC] sent me for tests. They took a scan, they made a scan and they found out that I have bad bones, weak bones and that I have a disturbance, problem, with my equilibrium center in the brain, osteoporosis and strong depression they found and problems with my muscles as well that makes me go all stiff. Should I explain further?

> (Tr. 33).

Plaintiff also testified that she suffered from migraine headaches for which she took pills as prescribed by Dr. Kerry. (Tr. 34). She testified that she fell at work and hurt her knee

due to her equilibrium problem, but felt she had to keep that a "secret at my job because I felt that if they found out they would fire me and I can't afford to be without a job because I have bills to pay." (Id.) Plaintiff testified that she fell if she looked up high or down low, which caused a problem at work if she was asked to perform a duty that required her to do so. (Id.) She testified that, if asked at work to clean something that required those maneuvers, she made up an excuse because she felt unable to tell them what the problem was. (Id.) Plaintiff testified that, from month to month, new problems emerged, and she felt incapable of working full time. (Tr. 34).

Plaintiff testified that she saw Dr. Emir Keric, but had no insurance and had to pay his bills herself. (Id.) Plaintiff testified that Dr. Keric offered to make referrals for her to see other physicians for certain problems but she did not see those physicians, explaining: " . . . for example, one of them is a neuropsychiatrist. [Dr. Keric] said that I needed to see him and made the referral but when I called, in fact his office called over there and asked how much the examination would be over there when they told me I cancelled the appointment because I can not afford that." (Tr. 35). Plaintiff testified that she told her doctor that she could not afford that visit and that her doctor told her about available clinics. (Tr. 45). Plaintiff identified a particular clinic as one she could go to, but testified that she had been told that she would be required to "be their patient and

I did not want to change my doctors to be their patient because of problems with English." (Id.)

Plaintiff testified that she had a driver's license and had an old car that she drove rarely, when she had to go grocery shopping, and that a friend drove her to work every day. (Tr. 35). She testified that, due to dizziness, she felt incapable of driving every day. (Id.) Plaintiff testified that she once had a car that was repossessed because she became unable to afford the payments. (Id.)

Plaintiff testified that she experienced constant pain in her legs and arms that felt worse when she was working, and also had pain in her legs, feet and heels and had trouble walking. (Tr. 35-36). The record indicates that plaintiff appeared to have trouble estimating the amount of weight she could lift. See (Tr. 36). She testified that when her muscle and bone pain increased, she felt unable to lift any weight. (Id.) Plaintiff testified that the medication she took as prescribed by Dr. Keric caused nausea and stomach upset. (Id.)

Plaintiff testified that she had trouble showering because she once fell in the bathtub, and that she sometimes forgot to turn off the stove when cooking. (Tr. 38). She testified that she was forgetful, had trouble concentrating, cried, and felt upset and nervous and needed to call for help. (Id.) She testified that she sometimes left the house before she was fully dressed. (Tr. 38-39). She testified that she spent every morning sitting in a

dark room with the shades drawn, drinking coffee and taking her medication. (Tr. 39). Plaintiff testified that she lacked the mental and physical motivation to prepare food, clean her apartment, vacuum, or do laundry. (Id.) She testified that she was able to do the necessary shopping in the afternoon after her medication kicked in, and that her daughter helped her. (Tr. 40).

Plaintiff testified that she sometimes went out with friends for lunch or to listen to music, but did so far less often than she used to. (Tr. 40-41). She recently traveled internationally to visit her hospitalized mother, and used a wheel chair. (Tr. 41).

The ALJ then heard testimony from Morris Alex, M.D. Dr. Alex stated that "there are a number of complaints that need evaluation that have not been evaluated. I can only give a answer [sic] on limitations based on the evidence that's in the file." (Tr. 46). Dr. Alex opined that plaintiff was obese with a body mass index of 29. (Id.) He testified that some of plaintiff's records indicated anxiety and depression, but also indicated a relatively high Global Assessment of Functioning ("GAF") score and few limitations. (Id.) Regarding plaintiff's back and neck, Dr. Alex testified that medical records showed normal range of motion and negative neurological examination. (Tr. 46-47). Dr. Alex testified that medical records showed slight swelling of the knee, but that no x-ray was performed. (Tr. 47). Dr. Alex testified that medical records showed a diagnosis of vertigo, but

otolaryngological (also "ENT") examination was negative, and there was no examination to determine whether plaintiff "truly had vertigo or anything else." (Id.) Dr. Alex testified: "[t]here's no neuro to evaluate so that from the record at least, from the evidence we have she does not meet or equal a listing but from her complaints she certainly needs further evaluation and if she's not willing to accept changes physicians I don't know how she's going to be evaluated." (Id.)

The ALJ and Dr. Alex then had the following exchange:

Question (by the ALJ):

> Okay, based upon the objective findings in our record are there any reasonably certain limitations that you would apply to claimant?

Answer (by Dr. Alex):

> Not from the record. Subjectively she has complaints that could be limiting but there's no evidence in the file to support it.

Q.       Alright. Is there any particular studies you'd recommend?

A.       She needs an ENT evaluation. She needs to have a psychiatric evaluation and treatment.

> (Id.)

B.    Medical Records

Records from St. Alexius Hospital indicate that plaintiff was seen on August 16, 2004 following a motor vehicle accident in which she had been a restrained driver. (Tr. 285). Plaintiff

-8-

complained of back and neck pain, and headache, and had a contusion on her forehead. (Id.) A cervical spine MRI performed at Kirkwood MRI and Imaging on September 22, 2004 was normal. (Tr. 291).

Thoracic spine x-ray performed on October 28, 2004 revealed osteopenia (low bone mass that falls short of osteoporosis), and mild concavity of T10 through T12 vertebral bodies. (Tr. 292).

Plaintiff received follow-up care from Stanley L. London, M.D., beginning on August 26, 2004 through November 2, 2004. (Tr. 293-301). On August 26, 2004, plaintiff complained of neck and upper back pain, and physical examination revealed decreased cervical flexion, extension, left lateral flexion, right lateral flexion, left rotation and right rotation. (Tr. 293). Plaintiff was tender at C7 and T2 bilaterally. (Tr. 294). She was diagnosed with cervical and thoracic sprain/strain. (Id.) It was noted that, from August 23, 2004 through October 29, 2004, plaintiff was treated on 24 occasions. (Tr. 295). Throughout her treatment, plaintiff continued to show decreased range of motion and tenderness. (Tr. 293-98). Dr. London opined that plaintiff's prognosis was guarded. (Tr. 296). On October 22, 2004, Dr. London noted that plaintiff had not improved, and referred her to a spine specialist. (Tr. 301).

Records from St. Anthony's Hospital indicate that plaintiff was seen on April 2, 2007 for a bone density study, which revealed osteopenia. (Tr. 316). Bilateral lower extremity venous

ultrasound performed on March 29, 2007 due to complaints of leg cramping, revealed no signs of deep venous thrombosis. (Tr. 317).

Records from Emir Keric, M.D., indicate that plaintiff was seen on January 29, 2008 with complaints of continued vertigo. (Tr. 248). Dr. Keric wrote that plaintiff had no other complaints, and it appears that he wrote that plaintiff "has some pride in this." (Id.) Dr. Keric's impression was labyrinthitis,[2] high cholesterol, osteopenia, and increased anxiety. (Tr. 249). Plaintiff returned on February 25, 2008, and stated that her symptoms of vertigo were slightly better. (Tr. 250).

On April 28, 2008, plaintiff returned to Dr. Keric and stated that she felt better but needed prescriptions. (Tr. 252). Examination was within normal limits, and she was diagnosed with high cholesterol, osteopenia, and anxiety. (Tr. 252-53).

On June 17, 2008, plaintiff returned to Dr. Keric with complaints of pain in her fingers, tingling in both arms, and other complaints which are not legibly written. (Tr. 254). Examination was within normal limits. (Tr. 254-55). Among the diagnoses were anxiety, high cholesterol, and osteopenia. (Tr. 255).

On January 7, 2009, plaintiff returned to Dr. Keric apparently for complaints related to elevated cholesterol, although the records are somewhat illegible. (Tr. 257). Examination was

---

[2]Labyrinthitis is inflammation of the labyrinth (the internal ear), sometimes accompanied by vertigo and deafness. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000), available at STEDMAN'S 220880 (Westlaw).

within normal limits. (Tr. 257-58).

On August 18, 2009, plaintiff saw Dr. Keric with complaints of increased depression, anxiety, panic attacks, and pain in her lower back. (Tr. 259). She complained of an inability to sleep at night, and poor concentration. (Id.) Examination was within normal limits. (Tr. 259-60). Dr. Keric diagnosed plaintiff with depression with panic disorder, and also diagnosed her with osteoporosis, and prescribed the medications indicated above. (Tr. 260).

On October 19, 2009, Dr. Keric opined that plaintiff had tenderness over her low back and right hip; joint abnormality in her back/spine; inattention, poor sleep, depression and anxiety. (Tr. 241). Dr. Keric indicated his diagnoses as depression with panic disorder, low back pain, and osteopenia. (Id.) He wrote that plaintiff had low attention, moderate depression, chronic pain, and a moderately reduced work ability. (Id.)

On December 28, 2009, plaintiff underwent a psychological evaluation with Lenora V. Brown, Ph.D., a licensed psychologist. (Tr. 265-68). Plaintiff reported that she had driven to the examination, and that she last worked as a part time housekeeper in November of 2009, having stopped working because she could no longer lift heavy trash bags. (Tr. 265). Plaintiff complained of osteoporosis and depression, and stated that she had dizzy spells and periods of forgetfulness which began two years ago. (Id.) Plaintiff stated that she became dizzy if she had to raise her head

and look up, and lost her balance at times, adding that she could not sit or work for long periods of time. (Id.) She reported that, after a fall, she had tests done at BJC Health Center, but had no details regarding the type of tests or the results. (Id.) She stated that her symptoms were worsening, and that she required follow-up care but lacked health insurance. (Tr. 265).

Plaintiff reported social isolation, and symptoms of clinical depression for two hours per day, seven days per week. (Id.) She reported that she sat in a dark room with the window covered, thought that everyone hated her, forgot many things, and cried a lot. (Id.) Plaintiff reported insomnia and diminished appetite. (Id.) She reported little benefit from psychotropic medications. (Tr. 265-66). She denied present or past alcohol consumption or illicit drug use. (Tr. 266). Plaintiff reported having completed 8 years of formal education, which exceeded the usual amount of education provided to females in her country at the time. (Id.)

Plaintiff's affect was within normal limits, and plaintiff reported that she felt nervous, as though she was in trouble and had to present for the evaluation. (Tr. 267). Plaintiff's speech and thought content were normal, she was alert and oriented in all spheres, her memory was intact, her insight and judgment was fair, and she performed simple calculations easily. (Id.)

Plaintiff reported that she needed help paying bills,

sometimes forgot that the stove was on while cooking, and required assistance from her daughter to shop. (Id.) She reported knowing how to perform household chores but did not do so due to osteoporosis, which caused fatigue. (Id.) Plaintiff denied problems getting along with other people, but stated that she socially isolated herself and no longer engaged in activities she once enjoyed. (Id.)

Dr. Brown opined that plaintiff was mildly impaired in her activities of daily living, social functioning, and ability to care for her personal needs. (Tr. 267-68). Concentration, persistence and pace were adequate. (Tr. 268). Dr. Brown diagnosed plaintiff with major depressive disorder, recurrent and moderate; and osteoporosis by plaintiff's history. (Id.)

On January 20, 2010, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form. (Tr. 270-80). Dr. Toll opined that plaintiff suffered from Major Depressive Disorder, and had a mild degree of limitation in activities of daily living, and maintaining social functioning, persistence, or pace. (Tr. 273, 278).

On February 1, 2010, plaintiff returned to Dr. Keric with complaints of pain in her arms and back. (Tr. 308). Examination was within normal limits. (Tr. 308-09). Dr. Keric diagnosed osteoporosis, chronic low back pain, high cholesterol, and depression. (Tr. 309).

Records from St. Anthony's Medical Center show that

plaintiff was seen in the emergency room on March 17, 2010 for complaints of neck pain, headaches, and mild numbness around her lips following a rear-impact motor vehicle accident at approximately 30 to 40 miles per hour. (Tr. 319, 324). Plaintiff was diagnosed with head injury and neck trauma. (Tr. 326). CT scans of the cervical spine and head were negative. (Tr. 339, 341). Chest x-ray revealed hypoventilation. (Tr. 343).

Plaintiff returned to Dr. Keric on April 9, 2010 with complaints of pressure in her right ear, "rumbling," insomnia, anxiety, and fearfulness following a car accident. (Tr. 306). She stated that physical therapy was helping. (Tr. 307). She was diagnosed with acute cervical sprain, post-traumatic stress disorder, depression, high cholesterol, and osteoporosis. (Tr. 306). She returned on August 11, 2010 with complaints of left knee pain and an inability to bend the knee, secondary to a fall one week ago. (Tr. 304). Plaintiff's knee was swollen and painful upon palpation. (Id.) She was diagnosed with internal derangement of the knee, post-traumatic stress disorder, panic attack, and ankle demineralization. (Id.) On August 19, 2010, plaintiff returned to Dr. Keric with complaints of dizziness and headache with eye redness and light sensitivity. (Tr. 302). She was diagnosed with migraine headache, internal derangement of the knee not otherwise specified, ankle demineralization, panic attack, and depression. (Id.)

The record indicates that plaintiff took the following

prescription medications: Alendronate[3] for osteoporosis, Meclizine[4] for balance, Fluoxetine[5] for depression, Lorazepam[6] for anxiety, Amitriptyline[7] for depression, Ibuprofen (Motrin) for headaches, and Crestor[8] for high cholesterol.  (Tr. 239).  Prescriptions for these medications are found throughout the medical evidence.

### III.    The ALJ's Decision

The ALJ determined that plaintiff met the insured status requirements of the Act through December 31, 2013, and had not engaged in substantial gainful activity since January 19, 2009, the

---

[3]Alendronate is used to treat and prevent osteoporosis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601011.html

[4]Meclizine is used to treat nausea, vomiting, and dizziness caused by motion sickness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548.html

[5]Fluoxetine, also known as Prozac, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.  http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a689006.html

[6]Lorazepam, also known as Ativan, is used to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a682053.html

[7]Amitriptyline, also known as Elavil, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a682388.html

[8]Crestor, or Rosuvastatin, is used together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in your blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603033.html

alleged onset date.[9]  (Tr. 11).

    The ALJ determined that plaintiff had the following medically determinable impairments: osteopenia, major depressive disorder, anxiety disorder, and hyperlipidemia (high cholesterol). (Id.)  The ALJ determined that plaintiff did not have an impairment or combination of impairments that had significantly limited, or was expected to significantly limit, her ability to perform basic work-related activities for 12 consecutive months, and that plaintiff therefore did not have a severe impairment or combination of impairments.  (Tr. 12).  The ALJ analyzed plaintiff's alleged mental impairment under the paragraph B criteria, and determined that her medically determinable mental impairment was nonsevere because it caused no more than "mild" limitation in any of the first three functional areas, and "no" limitation in the fourth area.  (Tr. 13-14).

    The ALJ analyzed the medical and other evidence of record and considered plaintiff's allegations in light thereof.  The ALJ wrote that he considered plaintiff's symptoms, and the extent to which they could be accepted as consistent with the evidence of record, in reaching his step two conclusions.  The ALJ also wrote that plaintiff had a "generally unpersuasive appearance and demeanor while testifying at the hearing" inasmuch as she

---

[9]The ALJ noted that, while plaintiff had worked since her onset date, her work did not rise to the level of substantial gainful activity.  (Tr. 11).

"displayed no outward evidence of physical symptoms such as pain or discomfort" and was able to respond adequately to questions. (Tr. 16). The ALJ noted that this was entitled to some weight, but was being considered with other factors. (Id.) The ALJ concluded that plaintiff's subjective complaints were not fully credible and were inconsistent with the medical evidence of record. (Id.) The ALJ concluded that plaintiff had not been under a disability, as defined in the Act, at any time through the date of the decision. (Tr. 17).

## IV. Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. § 423(d)(1)(A) (definition of disability), 20 C.F.R. § 404.1520 (sequential evaluation process). A "disability" under the Act is an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Act further specifies that a person must be both

unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." 42 U.S.C. §§ 423(d)(2)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. In Bowen, the Supreme Court upheld the validity of step two's threshold severity requirement and, in regard to the application of that requirement, adopted a standard which provides that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the sequential evaluation process. 482 U.S. at 158. While the standard of proof is low, it "is also not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a

claimant failed to make this showing." Kirby, 500 F.3d at 707 (internal citation omitted). It is plaintiff's burden to establish that her impairment or combination of impairments is severe. Id. If the claimant's impairment is not severe, then she is not disabled.

If the claimant's impairment(s) is severe, the Commissioner continues the sequential evaluation process and determines whether it meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable

person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003) (citing

<u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ conducted a legally insufficient credibility determination. In support, plaintiff argues that the ALJ discredited her largely on her failure to "sit and squirm" during the administrative hearing, citing <u>Cline v. Sullivan</u>, 939 F.2d 560 (8th Cir. 1991) in support. Plaintiff also claims that the ALJ erroneously failed to elicit testimony from a vocational expert ("VE"). In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

A.  <u>Credibility Determination</u>

In the case at bar, the ALJ based his step two determination in part on his decision that plaintiff's subjective allegations were not fully credible. Plaintiff challenges this determination, arguing that the ALJ placed undue weight on her demeanor during the administrative hearing. In response, the Commissioner contends that the ALJ was entitled to consider plaintiff's demeanor, and that his adverse credibility determination was also supported by the lack of objective medical evidence to support plaintiff's allegations, and her limited medical treatment history. Having considered these arguments in light of the ALJ's decision and the record as a whole, the undersigned determines that the ALJ's decision requires remand.

As explained above, the ALJ in this case ceased the sequential evaluation process after finding, at step two, that plaintiff did not have a "severe" impairment or combination of impairments. At step two, the burden is on the claimant to establish a severe impairment. <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). Normally, credibility determination occurs at step four, before an ALJ determines a claimant's residual functional capacity. <u>See</u> <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall</u>, 274 F.3d at 1217) (before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints). However, the ALJ in this case wrote that he considered plaintiff's symptoms, and the extent to which they could be accepted as consistent with the evidence of record, in reaching his step two conclusions. (Tr. 12). The ALJ wrote that he did so based upon the requirements of 20 C.F.R. § 404.1529, and SSRs 96-4p and 96-7p. (<u>Id.</u>) The undersigned now turns to the ALJ's credibility determination.

In <u>Polaski v. Heckler</u>, the Eighth Circuit set forth the following standard for the administrative adjudicator to use when determining the credibility of a claimant's subjective allegations:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations

by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

739 F.2d 1320, 1322 (8th Cir. 1984).

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In this case, the ALJ analyzed the medical evidence of record, and concluded that the "objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations" and that, while there was evidence of underlying impairments that could cause some symptoms,

"the medical evidence does not demonstrate medical signs and findings that could reasonably be expected to produce all of the symptoms and limitations alleged." (Tr. 15).

The ALJ noted the following inconsistencies in the record to support his decision to discredit plaintiff's allegations: (1) plaintiff's limited medical treatment history; (2) the lack of an opinion of disability from a treating or examining physician; (3) plaintiff's daily activities; (4) plaintiff's use of medications and lack of side effects; (5) plaintiff's demeanor during the hearing. Having considered the ALJ's credibility determination with the requisite deference, and having examined each of the alleged inconsistencies cited by the ALJ, the undersigned is not persuaded that they constitute substantial evidence to support the ALJ's credibility determination.

### 1. Plaintiff's History of Medical Treatment

In support of his adverse credibility determination, the ALJ wrote that plaintiff had "a relatively limited history of medical treatment" and had no "surgery, physical therapy, chiropractic treatments, or treatment at a pain clinic." (Tr. 15). The ALJ noted that plaintiff did not use a transcutaneous electrical nerve stimulation, or TENS unit, for pain, nor did she receive recent emergency room treatment, hospitalizations, or injections for pain relief. (Id.) Regarding plaintiff's alleged mental impairments, the ALJ noted that plaintiff had no recent psychiatric hospitalizations, and that plaintiff had not been

treated regularly by a psychologist or psychiatrist. The ALJ wrote that he found "no persuasive evidence that the claimant has been refused medical treatment due to an inability to pay." (Tr. 15).

A lack of regular and sustained treatment is a basis for discounting complaints, and is an indication that the claimant's impairments are nonsevere and not significantly limiting for twelve continuous months. Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995). However, the Eighth Circuit has recognized that "a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be . . . an independent basis for finding justifiable cause" to excuse a claimant's noncompliance with prescribed treatment. Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984).

This administrative record contains evidence that plaintiff: (1) had no health insurance and was paying for the medical care she did obtain out of her own wages which, as the ALJ himself noted, were too meager to even qualify as substantial gainful activity; (2) made an effort to seek medical care from a specialist referred by Dr. Keric but cancelled the appointment after discovering she could not afford the specialist's fee; and (3) was subject to a language and cultural barrier that she felt precluded leaving Dr. Keric's care and seeking care at a low-cost/free clinic. While the undersigned recognizes that an alleged lack of financial means does not automatically preclude an ALJ from considering a claimant's failure to obtain medical care, Hutsell v.

<u>Sullivan</u>, 892 F.2d 747, 750 n. 2 (8th Cir. 1989), the ALJ in this case appears to have summarily dismissed this issue without duly considering it. The undersigned therefore cannot confidently say that the ALJ duly considered whether plaintiff's subjective allegations were consistent with the level of medical treatment she sought and could afford. <u>See</u> <u>Brown v. Sullivan</u>, 902 F.2d 1292, 1295 (8th Cir. 1990) (citing <u>Tome</u>, 724 F.2d at 714).

2.   <u>Lack of an Opinion of Disability</u>

The ALJ also noted that the record contained no evidence from plaintiff's physicians indicating that she had restrictions greater than those determined in the decision. An ALJ may properly consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition. <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996).

In this case, treating physician Dr. Keric's October 19, 2009 opinion indicates that plaintiff had a "moderate reduced work ability," and difficulties in maintaining social functioning due to depression and anxiety. (Tr. 241). In discussing Dr. Keric's opinion, the ALJ wrote, <u>inter alia</u>, that Dr. Keric had noted "no restrictions of activities of daily living or episodes of deterioration in a work-like setting." (Tr. 15). In Dr. Keric's opinion, however, he wrote that it was "unknown" whether plaintiff would experience episodes of deterioration in a work-like setting, not that she was unrestricted in this area. (Tr. 241). Also notable is Dr. Keric's opinion that plaintiff would have

difficulties in maintaining social functioning due to depression and anxiety. The ALJ made no mention of this when discussing Dr. Keric's opinion, despite the fact that the ALJ specifically determined that plaintiff had no more than mild restrictions in terms of social functioning. While it is true that Dr. Keric did not use any adjectives to describe the level of difficulties in maintaining social functioning, the fact that the ALJ did not address this undermines confidence in his decision.

3. <u>Plaintiff's Daily Activities</u>

The ALJ also discussed plaintiff's daily activities in the context of evaluating her credibility. A claimant's daily activities are one of the specifically enumerated factors the ALJ should consider when evaluating a claimant's credibility. <u>Polaski</u>, 739 F.2d at 1322.

The ALJ wrote that plaintiff's limitations in daily activities could not be objectively verified, and that it was difficult to attribute her degree of limitation to her medical condition given the "weak medical evidence" and other factors. (Tr. 16). In support of his conclusion in this regard, the ALJ wrote: "[t]he evidence reflects that she lives alone, cares for her needs and the needs of her husband, does household chores, and does shopping." (<u>Id.</u>) This statement represents a complete mis-characterization of plaintiff's testimony.

The undersigned is unwilling to attribute the ALJ's reference to plaintiff caring for "the needs of her husband" as a

mere typographical error. Plaintiff testified that she was divorced when she came to live in St. Louis in July of 2000, the medical records contain references to plaintiff being divorced, and there is no testimony or evidence that she remarried or shared a home with a partner during the relevant time period. Furthermore, the ALJ had just stated, in the same sentence, that plaintiff lived alone. Finally, the balance of the ALJ's decision contains little weighing in favor of giving him the benefit of the doubt. The ALJ's reliance on plaintiff's performance of household chores and shopping is also troubling. Plaintiff testified that her adult daughter, who lived next door to her, helped her with these tasks. In fact, plaintiff testified that she had changed residences in order to live close to her daughter and avail herself of such assistance.

There is no evidence undermining plaintiff's description of the limitations in her daily activities, and the undersigned finds that the ALJ improperly relied upon plaintiff's daily activities of household chores, shopping, and "caring for her needs and the needs of her husband" (Tr. 16) as part of his adverse credibility determination. See O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (finding remand necessary when, in part, there was no evidence undermining the claimant's description of the limitations in her daily activities).

4. Plaintiff's Use of Medication and Lack of Side Effects

The ALJ also noted that plaintiff's use of medication did not suggest the presence of an impairment(s) more limiting than found in the decision. However, as summarized above, plaintiff routinely took prescription medications for depression, anxiety, and vertigo/motion sickness. It may be that the ALJ was referring to only prescription <u>pain</u> medication, which does appear absent in the case at bar. However, the ALJ was not specific in this regard, and the undersigned is unwilling to speculate as to what the ALJ meant. While the lack of prescription medication is inconsistent with allegations of disabling impairments, <u>Rankin v. Apfel</u>, 195 F.3d 427, 430 (8th Cir. 1999), in this case, plaintiff did take prescription medication.

The ALJ also noted that plaintiff's medications caused no side effects. Plaintiff testified that her medications caused nausea and stomach upset, but as the ALJ noted, the medical records do not document that plaintiff routinely complained of such side effects to Dr. Keric or to anyone else. While the undersigned cannot say that the ALJ erred in considering the lack of medication side effects, this evidence does not rise to the level of substantial evidence supporting the ALJ's credibility determination.

5. <u>Other Factors</u>

As the ALJ noted, plaintiff has a strong work history. Plaintiff testified that she regularly worked full time since coming to the United States; at one point simultaneously worked a

-29-

full time job and a part time job; and ceased working full time and started working part time only because her symptoms increased and left her feeling incapable of working full time. Plaintiff's consistent work history exhibits her determination to remain employed, and supports the credibility of her application for disability. See Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000).

While not raised by either party, the undersigned notes that, in the context of detailing his findings concerning plaintiff's medically determinable impairments, the ALJ wrote "[a]lthough the claimant has also reported having headaches and dizziness, there is no medically determinable impairment that could reasonably be expected to cause these limitations." (Tr. 11). Contrary to this observation, Dr. Keric diagnosed plaintiff with migraine headache in August of 2010, and on January 29, 2008, Dr. Keric diagnosed her with labyrinthitis. As defined above, labyrinthitis is an inflammation of the internal ear which can cause symptoms of vertigo. The record also demonstrates that plaintiff was prescribed medication for vertigo/motion sickness.

The undersigned is not recommending a finding that the ALJ erroneously failed to determine that migraine headaches and/or labyrinthitis were severe impairments. However, the ALJ's statement that there was no impairment to account for her complaints of headache and dizziness without any mention of plaintiff's diagnoses of migraine headache or labyrinthitis, or the fact that she had been prescribed medication for vertigo/motion

sickness, leave the undersigned unable to determine whether the ALJ considered and rejected such evidence, or whether he failed to consider it at all. This uncertainty further erodes the undersigned's confidence in the ALJ's step two findings.

### 6. Plaintiff's Demeanor During the Hearing

The ALJ also relied upon his personal observations of plaintiff's demeanor during the hearing. Citing Cline v. Sullivan, 939 F.2d 560 (8th Cir. 1991), plaintiff challenges the ALJ's reliance upon her demeanor, noting that the ALJ improperly dismissed her complaints based upon her failure to "sit and squirm" during the hearing.

As the Commissioner correctly notes, an ALJ is entitled to consider a claimant's demeanor during the hearing in evaluating the credibility of her subjective complaints. Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) (citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993)). However, an "ALJ is not free to reject a claimant's credibility on account of the claimant's failure to sit and squirm during the hearing." Cline, 939 F.2d at 568 (internal citation omitted). In the case at bar, in light of the other deficiencies in the ALJ's credibility determination, it would appear that the ALJ gave inordinate weight to this consideration. See Id. Similarly, while it is arguable that the objective medical evidence in this administrative record fails to fully support all of plaintiff's subjective allegations, the evidence is not of such nature as to suggest that plaintiff

-31-

invented her symptoms.

Because this administrative record reveals more evidence detracting from the ALJ's credibility determination than supporting it, it appears that the ALJ placed inordinate weight upon plaintiff's hearing demeanor, and upon the lack of objective medical evidence. Because the ALJ's credibility determination is not supported by substantial evidence on the record as a whole, and because the ALJ stated that he considered plaintiff's credibility in reaching his step two conclusion, the ALJ's step two determination is not supported by substantial evidence on the record as a whole. Plaintiff's diagnoses, considered with her subjective allegations and also with Dr. Alex's testimony that plaintiff required further evaluation, establish the need for further proceedings. The undersigned therefore recommends that the ALJ's decision be reversed and remanded for reconsideration. See Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003) (reversing where the ALJ's multiple reasons for discrediting the claimant were unsupported by the record because the supposed inconsistencies were not actually inconsistent and the ALJ relied on improper reasons to hold otherwise).

In her brief, plaintiff also argues that the ALJ erroneously failed to elicit VE testimony. On remand, it will be for the ALJ in the first instance to determine the necessity of VE testimony.

Therefore, for all of the foregoing reasons, on the

claims that plaintiff raises,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be reversed and this cause remanded to the Commissioner for further proceedings.

The parties are advised that they have until March 15, 2013 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact.  Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of March, 2013.